# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| MARCIA JACKSON, | ) |
| Plaintiff, | ) |
| | ) No. 4:06-CV-1378 CAS |
| v. | ) |
| | ) |
| GENERAL MOTORS, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's Motion for Summary Judgment. Plaintiff Marcia Jackson opposes the motion. For the following reasons, the Court will grant the motion in part and deny the motion in part.

## I. Background

Plaintiff Marcia Jackson, an African-American female, filed this action against her former employer, General Motors, asserting claims of race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (Count I) and the Missouri Human Rights Act ("MHRA") (Count II). Defendant moves for summary judgment on both counts on the ground that plaintiff cannot establish a prima facie case of race or gender discrimination under either Title VII or the MHRA. Moreover, defendant asserts that assuming plaintiff could establish a prima facie case of race or gender discrimination, it would be entitled to summary judgment because General Motors' decisions regarding plaintiff were legitimate and non-discriminatory and not pretext for unlawful discrimination.

## II. Legal Standard

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in his pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000); Allen v. Entergy Corp., 181 F.3d 902, 904 (8th Cir. 1999). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112,

1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving this motion for summary judgment.[1]

### III. Facts

Plaintiff Marcia Jackson, an African-American woman, began working for defendant General Motors ("GM") on April 1, 1985. Plaintiff has spent her entire career at GM as an hourly employee and a member of the collective bargaining unit at GM's Wentzville, Missouri assembly plant. From 1985 to 1996, plaintiff worked in the plant's trim department. From 1996 to 2000, plaintiff was assigned to the plant's pre-trim department, a sub-department of trim, in a job on the assembly line. In 2000, plaintiff bid for and won a job as a license bucket assembler in the pre-trim department. The license bucket assembler position requires the sub-assembly of handles and the license plate bucket. Because sub-assembly jobs are not directly on the assembly line, these positions allow the employee to have more control over the pace of his or her work.

**The Incident Involving Ms. Spruill's Work Stool**

In November 2004, plaintiff had a verbal dispute with Clara Spruill, an African-American female coworker, regarding Ms. Spruill's use of a large industrial fan in the plant. Ms. Spruill had previously complained to management that plaintiff was making too much noise while performing her

---

[1] Plaintiff admitted most of the facts as stated in defendant's statement of uncontroverted material facts. The Court's recitation of the facts therefore follows defendant's statement where uncontested.

job duties. Plaintiff did not receive any discipline as a result of the noise complaint or the incident involving the fan.

On December 4, 2004, plaintiff was sitting with an African-American male coworker, Charlton Little, in plaintiff's work area when Mr. Little took Ms. Spruill's work stool and, as a practical joke, placed it in a van. Plaintiff told Mr. Little to retrieve the stool and return it to Ms. Spruill, but before he did so, Ms. Spruill noticed her stool was missing and contacted plant security. Security responded and removed Mr. Little from the work area. Mr. Little was suspended for the remainder of his shift plus one day for being out of his work area. He was not moved from his job assignment. (Pl. Statement of Additional Facts, ¶ 13).

The following Monday, December 7, 2004, plaintiff was called to the plant labor relations department and informed by a union representative that she was being moved to the chassis department. The chassis department consists of approximately 800 employees and multiple positions. The majority of positions in the chassis department are directly on the assembly line.

Plaintiff was stressed and upset because of her reassignment, and requested the necessary papers to go on sick leave. Plaintiff began sick leave on December 8, 2004, and did not return to work until April 11, 2005. During her leave, the union filed a grievance on her behalf regarding the move to chassis, and it was settled by allowing her to return to her job in pre-trim. Therefore, when plaintiff returned from her sick leave, she was assigned to her license bucket assembler position in the pre-trim department. Plaintiff has never worked in the chassis department, and does not know the job to which she would have been assigned if she had reported to chassis. During her first week back on the job, Leonard Stauffer, another hourly employee who worked as a team leader, told plaintiff

that Ronald Thornley, Supervisor of Labor Relations, removed her from the job in pre-trim because she was Mr. Little's girlfriend. Plaintiff denies ever having any romantic relationship with Mr. Little.

**The Tracy Evans Incident**

Plaintiff returned to work on April 11, 2005, and worked without incident until April 27, 2005. On April 27, 2005, plaintiff was leaving her work station to use the restroom, and walked past a white co-worker, Tracy Evans, who was working at a nearby work station on the assembly line. Both Ms. Evans and another co-worker, Gail Langenecker, provided statements to GM that plaintiff physically bumped into Ms. Evans. Plaintiff denies having any physical contact with Ms. Evans. Three other GM employees signed statements describing what they had witnessed. None witnessed a bump and none described plaintiff's conduct as aggressive.

After plaintiff passed Ms. Evans, Ms. Evans asked plaintiff to walk in the aisle next to the assembly line because people were trying to work in the area where plaintiff had walked. Plaintiff turned around and told Ms. Evans that she had the right to walk where she pleased, and continued to the restroom. As plaintiff returned to her work area, she contends Ms. Evans stood in the aisle and plaintiff waited for her to move before returning to her work area.

During the next scheduled break, plaintiff saw Ms. Evans leave the line with a supervisor, and later observed Mr. Thornley and other labor relations employees come into the work area. Mr. Thornley appeared to be taking statements from other employees regarding the incident between plaintiff and Ms. Evans. Mr. Thornley then approached plaintiff at her work station and told her that she had committed workplace violence, and that she would be interviewed by labor relations after lunch.

Plaintiff had a disciplinary interview with Mr. Thornley and Holly Vanhooser, another labor relations representative, and was suspended indefinitely pending a further investigation as to the seriousness of what GM termed her "workplace violence actions" involving Ms. Evans. Plaintiff provided a written statement during the interview, which she prepared with the assistance of her union representative, Mark Ehrle. Mr. Thornley and Ms. Vanhooser told plaintiff she had to leave the plant immediately.

The following day, plaintiff's health care provider approved her for sick leave. On May 4, 2005, plaintiff received written notice that her indefinite suspension had been converted to a disciplinary layoff for the remainder of her shift and two weeks. Management decided on the two-week suspension due (in part) to the seriousness of the offense, a decision it made based in the belief that physical contact had occurred and that plaintiff had acted in an aggressive manner. The notice also stated that plaintiff was to return to work on May 12, 2005, and indicated she was being reassigned to the chassis department. The notice did not indicate the specific position within the chassis department to which plaintiff would be assigned.

On May 26, 2005, plaintiff returned to work, and eventually reported to the chassis department. When she reported to chassis, she asked to go to the plant's Employee Assistance Program ("EAP"). Plaintiff was allowed to go to EAP, and asked the EAP representative for permission to leave the plant because she was "stressed," "distraught," and "depressed" about her treatment by GM and the transfer out of pre-trim. Plaintiff was given permission to leave the plant, having been credited for working four hours that day. She does not recall being assigned to a particular position in the chassis department before leaving. Plaintiff has been on medical leave of absence from GM since leaving the plant on May 26, 2005.

6

Plaintiff contends that her removal from the pre-trim position in December 2004 and reassignment to the chassis department constituted gender discrimination, and that her two-week suspension and transfer to the chassis department in April 2005 constitute race discrimination. Plaintiff alleges that both Mr. Thornley and Ms. Vanhooser discriminated against her on the basis of race, and that Mr. Thornley discriminated against her based on gender. Neither Mr. Thornley nor Ms. Vanhooser made any racist or race-based comments or innuendos to plaintiff.

**IV. Discussion**

    **A.    Gender Discrimination**

Plaintiff alleges GM discriminated against her based on her gender when it removed her from her pre-trim position on December 7, 2004 and reassigned her to the chassis department. Defendant moves for summary judgment on plaintiff's claims of gender discrimination, asserting that the reassignment was a lateral transfer that does not amount to an adverse employment action.

To establish a prima facie case of gender discrimination under Title VII, plaintiff must establish (1) she was a member of a protected group, (2) she was meeting the legitimate expectations of her employer, (3) she suffered an adverse employment action, and (4) there are facts that permit an inference of discrimination. See Holland v. Sam's Club, 487 F.3d 641, 644 (8th Cir. 2007). Recently, the Missouri Supreme Court held that the standard for summary judgment on a MHRA claim differs from federal claims. See Daugherty v. Maryland Heights, --- S.W.3d ---, 2007 WL 2247365 (Mo. Aug. 7, 2007). Under the MHRA, plaintiff's claims of discrimination can survive summary judgment if there is a genuine issue of material fact as to whether her gender was a "contributing factor" in GM's adverse employment actions. Id. at *4. GM does not contest that plaintiff is a member of a protected group. Nor does GM contest that plaintiff's job performance was

acceptable. GM argues, however, that plaintiff's transfer to the chassis department did not constitute an adverse employment action. GM characterizes the transfer as a lateral transfer that cannot constitute an adverse action.

        1.      <u>Adverse Employment Action</u>

An adverse employment action is one that causes a material change in the terms or conditions of employment. See Brown v. Lester E. Cox Med. Ctr., 286 F.3d 1040, 1045 (8th Cir. 2002). Not everything that makes an employee unhappy is actionable. Loss of status and prestige alone does not rise to the level of an adverse employment action. See Meyers v. Nebraska Health and Human Servs., 324 F.3d 655, 659-60 (8th Cir. 2003). A transfer or reassignment may rise to the level of an adverse employment action if it is "a significant change in working conditions." Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000).

        *(a)*      *Reduced Opportunities for Overtime*

Plaintiff does not allege that her transfer to the chassis department would have resulted in a reduction in her rate of hourly pay. Rather plaintiff argues that her transfer to the chassis department would have resulted in a reduction in line times, and therefore a reduced opportunity for overtime pay. Plaintiff contends that the line times were greater for the pre-trim department than in parts of the chassis department. As support, she cites documents establishing that during several months in 2006 and 2007, line times for the pre-trim department exceeded those for two areas of the chassis department (the "C2" and "Body Drop" areas).[2] (Def. SOF 19; Pl. Resp. to Def. SOF 19).

---

[2]Plaintiff was transferred to the chassis department in December 2004 and in May 2005. The relevant time period for determining whether the chassis department had less overtime opportunity than the pre-trim department would be directly after plaintiff was transferred. Based on the testimony of GM's Supervisor of Salaried Personnel, Joseph Hogan, however, GM did not maintain documents charting line times prior to March 2006. Mr. Hogan was not aware of any other documents that

8

Defendant attaches to its motion the deposition of Joseph Hogan, Supervisor of Salaried Personnel at GM's Wentzville plant. Mr. Hogan testified regarding the charts of line times produced by GM from March 2006 to May 2007. Mr. Hogan testified that three columns on these charts reflect work done in the chassis department, columns labeled ""C2," "Chassis 1," and "Body Drop." (Def. Mot., Ex. C, Hogan Dep. at 26). Defendant cites to line times in the "C2" and "Chassis 1" columns to support its position that plaintiff would not have had less overtime opportunity in the chassis department. GM presents evidence that during the months March through October 2006 one of the chassis areas worked more overtime than pre-trim, except for in July and September.[3] In July and September of 2006, two areas in the chassis department had less overtime than pre-trim. (Def. SOF at 19). Defendant also argues that because plaintiff grieved her transfer and therefore never reported to chassis upon her return in April 2005, plaintiff is speculating when she states her transfer would have resulted in less overtime.

Plaintiff cites to the line times in the "C2" and "Body Drop" columns to support her position that she would have had less overtime opportunities in the chassis department. (Pl. Resp. to Def. SOF 19). She states that for the months April through September of 2006 and January, February, and May of 2007, line times for the pre-trim department exceeded the "C2" part of the chassis department. For the months July through October of 2006 and January, February, and May of 2007, line times for

---

would reflect the comparative amount of overtime worked between the chassis, trim, and pre-trim departments. (Def. Mot., Ex. C, Hogan Dep. at 33).

[3] Although GM's employee Joseph Hogan testified that three areas on the charts of line times reflected work done in the chassis department, GM refers to only two parts of the Chassis department, "C2" and "Chassis 1."

9

pre-trim exceeded that of the "Body Drop" part of the chassis department. (Pl. Resp. to Def. SOF, 19).

Based on the evidence produced by the parties, whether plaintiff would have had less overtime opportunity in the chassis department depends upon to which part of the chassis department she would have been assigned. Plaintiff concedes this point when she argues line times "were greater for the pre-trim department than *in parts* of the chassis department." (Pl. Opp'n at 5) (emphasis added). Additionally, the line times vary per month, and therefore the Court cannot find generally that any part of the chassis department had more overtime than the pre-trim department without reference to a particular month.

As the non-moving party, plaintiff is entitled to all reasonable inferences that might be drawn from the evidence, but not to inferences that may only be drawn by resorting to speculation. See Williams v. City of Carl Junction, Mo., 480 F.3d 871, 873 (8th Cir. 2007). The record is undisputed that plaintiff never reported to the chassis department after her assignment to that department in December 2004. On May 26, 2005, plaintiff reported to the chassis department, but immediately asked to go to the plant's Employee Assistance Program. She then left the plant and has been on a medical leave of absence from GM since leaving the plant. Plaintiff has never been assigned to a particular position in the chassis department. Because plaintiff never reported to the chassis department and never received a job assignment, she can only speculate regarding whether she would have lost overtime opportunities because of her transfer. Although plaintiff is entitled to all reasonable inferences that may be drawn in her favor, the Court will not resort to speculation. The

Court cannot find that plaintiff would have had less overtime opportunities in the chassis department without the benefit of knowing to which job she would have been assigned.[4]

### *(b)    Sub-Assembly Position Versus Assembly Line Position*

Even if plaintiff's transfer would not have resulted in a reduction in pay or benefits, it still might constitute an adverse employment action if it resulted in a tangible change in working conditions that produced a material employment disadvantage. See Brown v. Lester E. Cox Med. Ctr., 286 F.3d 1040, 1045-46 (8th Cir. 2002). To be adverse, an employment action "must do more than merely make an employee unhappy, but it need not always involve termination or even a decrease in benefits or pay." Id. A transfer constitutes an adverse employment action where the transfer results in a significant change in working conditions. See Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 919 (8th Cir. 2000) (upholding finding of adverse action where plaintiff's transfer from corporate sales unit to pork sales unit was essentially a demotion).

Plaintiff's position in the pre-trim department was a sub-assembly position that allowed her to have more control over the pace of her work than a job directly on the assembly line. In 2000, she bid on and won this position because of her sixteen years of seniority with GM. (Jackson Aff., ¶ 2). Plaintiff has testified that her sub-assembly job as a license bucket assembler in the pre-trim department is more desirable than a job on the assembly line. Id. at ¶ 3. Plaintiff also presents an affidavit of Carolyn Bogan, who currently works in Ms. Jackson's former position, who states that the sub-assembly job as a license bucket assembler is more desirable than a job directly on the

---

[4]Plaintiff cites the case Owens v. GMC, No. 4:04-CV-420 CEJ, 2005 U.S. Dist. LEXIS 33484, *10 (E.D. Mo. 2005) for the proposition that this Court has previously found there are fewer opportunities to work overtime in the chassis department. In Owens, however, the Court was comparing the chassis department with the body shop. The Court did not find that the chassis department had fewer overtime opportunities than the pre-trim department.

11

assembly line. (Bogan Aff., ¶ 5). Ms. Bogan has seventeen years seniority, and won the position after Ms. Jackson took leave. Id. at ¶¶ 3, 7. Additionally, plaintiff testified that she considers the chassis department the least desirable part of the plant because the work is more physically demanding. (Jackson Aff., ¶ 5).

GM concedes that the majority of positions in the chassis department are directly on the assembly line. (Pl. Add. Facts at 3; Def. Reply at 5). Defendant does not address whether subjecting an employee to a more physically demanding job performed on a continuous assembly line versus a sub-assembly position constitutes an adverse action. Defendant also does not address plaintiff's argument that transferring her from a job that she won based on sixteen years seniority to a job directly on the assembly line constitutes an adverse action. Defendant argues only that plaintiff's claim stems from her "subjective and unsubstantiated opinions that the work in the chassis department is more difficult and less desirable than a job in pre-trim." (Def. Mem. at 6).

Although plaintiff's transfer to the chassis department would not have resulted in a cut in pay (and might or might not have resulted in less overtime), a jury could find that the transfer impacted a material aspect of her employment. The transfer most likely would have demoted plaintiff to a position directly on the assembly line, stripping her of the sub-assembly position that she had won based on her sixteen years seniority. Plaintiff has produced her own affidavit and that of another GM employee, both of whom state such a position is less desirable because it gives an employee less control over the pace of their work. Therefore, plaintiff has established the existence of a genuine issue of material fact as to whether GM's transfer of her from the sub-assembly position in the pre-trim department to the chassis department impacted a material aspect of her employment.

12

2. <u>Inference of Discrimination</u>

The only fact presented by plaintiff to permit an inference of gender discrimination in her transfer to the chassis department on December 7, 2004 is a statement made by Mr. Thornley to Leonard Stauffer, the team leader in the pre-trim department. Plaintiff has submitted an affidavit of Mr. Stauffer in which he states that Mr. Thornley stated he was transferring plaintiff because she was the girlfriend of Mr. Little, and he wanted to get back at Mr. Little by transferring plaintiff. Mr. Stauffer states:

> Mr. Thornley became more agitated and said he was moving Ms. Jackson from her job because she was the girlfriend of the employee who was suspected of moving the stool and that he wanted to get back at Mr. Little through Ms. Jackson. He said that the call about whether to remove Ms. Jackson wasn't mine to make.

Stauffer Aff., ¶ 9.

Defendant's only response to plaintiff's argument that she was transferred to chassis because she was the girlfriend of Mr. Little is contained in a footnote it its opening memorandum and a footnote in its reply brief. <u>See</u> Def. Mem. at 5 n.3; Def. Reply at 15 n.11. Defendant states only that the statement is hearsay and does not raise an inference of discrimination. In response, plaintiff contends that "this statement <u>is</u> competent summary judgment evidence and not hearsay as Stauffer has sworn to its occurrence under oath." Pl. Resp. at 14 n.10 (emphasis in original). This statement is not competent summary judgment evidence merely because it is contained in a sworn affidavit. <u>See</u> <u>Pink Supply Corp. v. Heibert, Inc.</u>, 788 F.2d 1313, 1319 (8th Cir. 1986) (finding that when an affidavit contains an out-of-court statement offered to prove the truth of the statement, the statement may not be used to support or defeat a motion for summary judgment). Regardless of whether the

13

statement is contained in a sworn affidavit, it is unlikely that Mr. Thornley's statement would be considered hearsay. Federal Rule of Evidence 801(d)(2)(D) states that a statement offered against a party that is made by the party's agent concerning a matter within the scope of the agency or employment and made during the existence of the relationship is not hearsay. See Fed. R. Evid. 901(d)(2)(D). The statement is offered against defendant, and Mr. Thornley is the Supervisor of Labor Relations at the defendant's vehicle manufacturing plant in Wentzville, Missouri. Based on the evidence before the Court, pursuant to Federal Rule of Evidence 801(d)(2)(D), it appears that the statement is not hearsay.[5]

Plaintiff need not produce direct evidence of gender discrimination to establish a prima facie case. It is enough that plaintiff articulate facts that permit an inference of discrimination. As the non-moving party, plaintiff is entitled to all reasonable inferences that might be drawn from the evidence. The Court finds it is reasonable to infer that plaintiff's transfer was motivated by unlawful gender discrimination. Mr. Thornley stated that he wanted to punish Mr. Little for placing the stool in the van. Instead of punishing Mr. Little by transferring him, however, he transferred plaintiff because she was Mr. Little's girlfriend. Although not direct evidence of gender discrimination, Mr. Thornley's statement permits the inference that plaintiff was transferred to the chassis department instead of Mr. Little because of her gender.

---

[5] Additionally, based on Mr. Stauffer's affidavit, Mr. Thornley was in a "highly agitated state" when he approached Mr. Stauffer, and "became more agitated" when he said he was moving plaintiff from her job because she was the girlfriend of Mr. Little. Even assuming the Court were to find the statement hearsay, it would likely fall within the hearsay exception for an excited utterance. See Fed. R. Evid. 803(2).

3.  Defendant's Legitimate, Non-Discriminatory Reason for Transfer

The McDonnell Douglas burden-shifting framework governs claims of gender discrimination under Title VII. See Holland, 487 F.3d at 644. Under this analysis, once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. If defendant articulates such a reason, plaintiff must then demonstrate that defendant's reason is a pretext for discrimination. The applicable standard in the Eighth Circuit on summary judgment "require[s] only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if the evidence [does] not directly contradict or disprove defendant's articulated reasons for its actions." Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 n.8 (8th Cir. 1994); see also Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1021 (8th Cir. 2005).

In its reply brief, for the first time, GM states that it transferred plaintiff and Ms. Spruill in December 2004 because of a history of disagreements between the two employees. For support, GM cites the deposition testimony of Ronald Thornley. Mr. Thornley gave conflicting testimony regarding whether Ms. Spruill was moved out of the pre-trim department after the stool incident. At one point in his deposition, he states that Ms. Spruill was not removed from her position; at another point, he states that both plaintiff and Ms. Spruill were moved out of the department. Compare Def. Ex. B at 71 with Def. Ex. B. at 222. Therefore, the record is not clear whether Ms. Spruill was transferred after the incident involving her work stool, and this remains a disputed issue of fact.

Neither side disputes that plaintiff was only marginally involved in the incident involving Ms. Spruill's work stool. In fact, the undisputed facts establish that plaintiff attempted to stop Mr. Little from placing the stool in the van. Despite these facts, plaintiff was transferred out of the department.

15

Mr. Little was not. Based on a statement made by Mr. Thornley to Mr. Stauffer, there is an inference that plaintiff was treated more harshly and transferred because she was the girlfriend of Mr. Little, which raises an inference of gender discrimination. GM counters with a legitimate non-discriminatory reason for its actions, i.e., plaintiff was transferred because of her ongoing dispute with Ms. Spruill. It is unclear, however, whether Ms. Spruill was similarly punished. This fact raises doubt as to the legitimacy of defendant's articulated reason. Additionally, the punishment directly followed an incident in which plaintiff was not the wrongdoer, and affirmatively tried to stop the wrongdoer from committing the act. This casts further doubt on defendant's articulated reason. Based on these facts, the Court finds that plaintiff has raised genuine doubt as to the legitimacy of defendant's articulated reason for its action. This precludes the entry of summary judgment on plaintiff's claims of gender discrimination under Title VII and the MHRA.

    **B.**    **Race Discrimination**

Plaintiff alleges GM discriminated against her based on race on two occasions: (1) when GM suspended her for two weeks without pay beginning in April 2005, and (2) when GM transferred her from the trim department to the chassis department in April 2005.[6] Defendant moves for summary judgment on plaintiff's race discrimination claims under Title VII and the MHRA, asserting that plaintiff cannot establish a prima facie case of discrimination.

---

[6] In defendant's statement of uncontroverted material facts, it states that plaintiff contends her transfer in December 2004 constituted gender discrimination, and her two-week suspension and transfer in April 2005 constituted race discrimination. (Def. SOF ¶ 49). Plaintiff agreed that these facts were undisputed. (Pl. Resp. to Def. SOF ¶ 49). Throughout her opposition brief, however, plaintiff refers to "race and/or sex" discrimination claims, without making a distinction between the two. Based on her admission of the facts, the Court will construe plaintiff's gender discrimination claim to include only her transfer in December 2004 and will construe her racial discrimination claim to include only her suspension and transfer in April 2005.

16

Title VII prohibits an employer from treating an employee differently because of race with respect to the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1). Under the burden-shifting framework of McDonnell Douglas Corp. v. Green, a plaintiff bears the initial burden of establishing a case of discrimination. 411 U.S. 792, 802-03 (1973). To present a prima facie claim of race discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified to perform her duties; (3) she suffered an adverse employment action; (4) under circumstances giving rise to an inference of discrimination. Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000). To withstand summary judgment under the provisions of the MHRA, plaintiff must establish a genuine issue of material fact as to whether race was a "contributing factor" in GM's adverse employment action. See Daugherty, 2007 WL 2247365 at *4.

For purposes of summary judgment, GM concedes the first two elements of plaintiff's prima facie case. Also, it concedes that plaintiff's suspension in April 2005 was an adverse employment action. The Court has already found the transfer of plaintiff from her sub-assembly position in pre-trim to the chassis department sufficient to establish the adverse conduct required to make plaintiff's prima facie case. Therefore, the Court focuses the remainder of its opinion on whether plaintiff can establish circumstances giving rise to an inference of racial discrimination.

1. Inference of Racial Discrimination

To establish an inference of racial discrimination, plaintiff argues she was treated more harshly than other GM employees who were alleged to have committed similar or more egregious acts of workplace violence but who were not members of plaintiff's protected class. The only evidence submitted by plaintiff to establish an inference of racial discrimination is disciplinary records of other employees accused of workplace violence. Plaintiff offers evidence that Caucasian men, Caucasian

17

women, and African-American men were all treated more favorably when accused of workplace violence. (Ex. 10-28). Plaintiff offers no evidence of how other African-American women accused of workplace violence were treated.

GM counters by offering evidence of several Caucasian men accused of similar acts of workplace violence who were treated more harshly than plaintiff. (Ex. G-I). GM also submits evidence of another African-American female accused of workplace violence (threatening to hit a co-worker in the head with an A-Pillar and various other harassing behavior) who received no disciplinary action. (Ex. J). Other than plaintiff, this was the only evidence of another African-American female who has been accused of workplace violence in a seven-year period. (Def. Reply at 12; Ex. J).

In all, the parties have submitted evidence that many Caucasian and African-American employees (male and female alike) have been treated more favorably than plaintiff. The parties have also submitted evidence that some Caucasian men have been treated more harshly than plaintiff. While this evidence might establish that plaintiff's discipline for workplace violence was severe and possibly even disproportionate to her offense, it does not suggest that GM was motivated by racial discrimination when it suspended plaintiff for two weeks and transferred her to the chassis department. The record does not demonstrate any pattern on the part of GM of treating specific classes of people more harshly than others. Based on the record, the instances of workplace violence appear to be handled on a case-by-case basis. Plaintiff has not met her burden of establishing an inference of racial discrimination based on GM's suspension and transfer of her in April 2005.

## 2. Defendant's Legitimate, Non-Discriminatory Reason for Transfer

Moreover, even assuming in the alternative that plaintiff has established a prima facie case of racial discrimination arising out of her suspension and transfer in April 2005, defendant has offered a legitimate, non-discriminatory reason for its actions. Specifically, it believed plaintiff had committed an act of workplace violence. Although not explicitly argued in her brief, plaintiff suggests that during its investigation GM improperly credited the statements of two white employees who were motivated to lie, and improperly discredited plaintiff's denial of the incident. Plaintiff's attempt to reargue the correctness of GM's decision does not raise an issue of material fact sufficient to preclude summary judgment. Plaintiff's denial of the facts surrounding the workplace violence incident, standing alone, is not evidence that raises an inference of discrimination or serves to establish that defendant's stated reason for the suspension and transfer was a pretext for illegal discrimination. See Stuart v. General Motors Corp., 217 F.3d 621, 636 (8th Cir. 2000). The relevant inquiry is whether GM believed that plaintiff was guilty of conduct that justified her suspension and transfer. See Scroggins v. University of Minn., 221 F.3d 1042, 1045 (8th Cir. 2000). Even if GM was completely mistaken in its belief that plaintiff committed workplace violence, any such mistake would not automatically prove that it was instead motivated by unlawful discrimination. See Johnson v. AT & T Corp., 422 F.3d 756, 762-63 (8th Cir. 2005).

Plaintiff has not met her burden of establishing an inference of racial discrimination based on GM's suspension and transfer of her in April 2005. Plaintiff also has not established that her race was a "contributing factor" in GM's adverse employment actions as required to defeat summary judgment on her MHRA claim. For these reasons, defendant's motion for summary judgment should be granted in part.

## V. Conclusion

For the foregoing reasons, the Court concludes that defendant's motion for summary judgment should be denied with respect to plaintiff's gender-based discrimination claims under Title VII and the MHRA arising out of plaintiff's transfer to the chassis department in December 2004. The motion should be granted with respect to plaintiff's race-based discrimination claims under Title VII and the MHRA arising out of plaintiff's suspension and transfer in April 2005.

Accordingly,

**IT IS HEREBY ORDERED** that defendant General Motors' motion for summary judgment is **GRANTED in part** and **DENIED in part** as set forth herein. [Doc. 38]

An appropriate partial judgment will accompany this Memorandum and Order.

_____
**CHARLES A. SHAW
UNITED STATES DISTRICT JUDGE**

Dated this 7th day of December, 2007.